Good afternoon. May it please the Court. My name is Ninh Vu, and I'm the counsel for Appellant Pier 1 in this case. We are here today to present you with two questions on this case. The first is whether the district court abused its discretion in excluding the declaration of the store manager, Tracy Snowe, in ruling on the cross-motions for summary judgment. The second question is whether, with the evidence that it had before it, including the Snowe declaration, whether Pier 1 should have received summary judgment and whether the Court should have denied summary judgment for Mr. Chapman. So I, for one, would just assume that you argue the second question, assuming that the declaration is in the record, because I'm not at all sure it makes a good difference. And I don't know that we need to get to the first one. So it would be helpful to me to hear the factual issues, not the procedural one. Of course. So let me explain, then, why the Chapman declaration was — I'm sorry, the Snowe declaration was so critical to the issue, the substantive issue in the case. Is that what you'd like to hear? Okay. Absolutely. So basically, on summary judgment, the only evidence of Pier 1's policies, practices, and procedures with regard to the maintenance of its aisles, as well as its counters, was in the Snowe declaration. And it was really quite case dispositive, because with the evidence in play, that made those items in the aisles that were encountered by Mr. Chapman temporary interruptions. They were essentially in transit, you see, because the policies basically — the policies and practices that Pier 1 had were that essentially the employees were required to go through every day, make sure that there are no items in the aisles, put back the things that they encounter. Sotomayor, did that make any difference what their policies were on paper or, as she said they were, if the evidence was that they weren't abiding by them? Well, Your Honor, there were — her declaration also established that there were 85 aisles. And if you take a look at the evidence that was submitted by Mr. Chapman, basically on his 11 visits, at no time were probably more than — I'd say on one occasion, Judy Chapman testified that it was up to nine aisles that had obstructions. Mr. Chapman said in his deposition testimony on one occasion it was 67 aisles. But other than that, there is no evidence of how many aisles were actually obstructed. And if you look at the photographs that were submitted by Mr. — Is that relevant to the ADA standard? Absolutely, Your Honor, because essentially context matters. If you take a look at the Department of Justice commentary to its maintenance of accessible features regulation, when it issued this regulation back in 1991, it basically said — let me just read it because it's easier. Section 36.211 provides that a public accommodation shall maintain an operable working condition if those features of facilities and equipment that are required to be readily achievable, accessible, and usable by persons with disabilities. And then it says the act requires that to the maximum extent feasible, facilities must be accessible to individuals with disabilities. So feasibility here is — feasible means you have to look at context. And we are talking about a pure one store with customers who like to pull out the merchandise to basically see how it looks. If any of you have ever shopped at a pure one store, you may have experienced this urge yourself. But basically, this is not a CVS, you know, where one might not want to put the Band-Aids out in the aisle to see what it looks like. This is a pure one — this is a store where you've got furniture and decorations and things that you are going to want to see. And so context matters. And the number of aisles matters. And that is all the information that was in the Snow Declaration. The Snow Declaration, if you look at what the definition of temporary interruption is — Ginsburg. I'm a little confused. If somebody is in a wheelchair and he wants to go see something on a particular aisle, and he can't get through that aisle, what difference does it make if he can get through some different aisle? Well, Your Honor, the ADA does not — it can't mandate perfection. And so it can only — But that's a different question as to whether — as to this temporary issue. But you're saying that it's okay — you can't be saying that if the — if he wants to buy some glasses and they're on a particular aisle, but that aisle is permanently blocked, that's okay, right? You're not saying that. We are absolutely not saying that. Okay. So what's the number of aisles have to do with anything then? Well, the number of aisles has to do with the fact that what is feasible within a particular context. So if you take a look, for example, at the transit cases where temporary — where the court looked at, you know, the — how successful the transit company was in terms of providing paratransit services or buses with accessible lifts, and the court basically — those courts determined that, you know, perfection is not the standard. You have to, you know — I think even 30 percent of the time not getting it right. So the court looked at 11 different times and found blocked aisles 11 different times, more than one on 11 different occasions with photographs. That's correct, but he never — The whole idea is that this policy isn't working very well. And so what's the relevance of the policy? Well, Your Honor, there is evidence that the policy was working and was being implemented because Mr. Chapman himself said in his declaration on three occasions he observed the employees doing precisely what the policy requires of them. And at a minimum, because of that, there is at least a dispute of fact on that issue, although we believe that summary judgment should have been granted, because really, you know, essentially the policy created — the policy made these items temporary. Without the — without the policy, those items are going to be there on the aisle indefinitely. With the policy, with the employees going through and picking up the items as they're supposed to do, the item is in transit to its proper place. And that is exactly what Judge Carlton ruled, is that the definition of temporary in the context of retail is that it is in transit. That's what the policy established. That was what was excluded incorrectly. And we would submit that summary judgment should have been granted for Pier 1. Now, let me just say one thing about — because we were focusing on the aisle, but actually on the counters. That is an issue that is also quite critical. And there, the evidence is absolutely compelling that Pier 1 should have received summary judgment. Mr. Chapman submitted evidence that on three occasions — three out of the 11 — that he saw items on the accessible counter. Well, the counters are there to be used by customers to put, you know, merchandise  The testimony — it would be one thing if there were — there was a permanent display on the accessible counter, which, you know, we've actually seen in other businesses. But that was not the case. If I encourage you to take a look at the photographs of the three instances of these cluttered counters, and you will see that on one occasion in 2012, there was a little Easter basket that was no more than 11 inches wide on a counter that is clearly 48 inches wide. So therefore, there was 36 inches of clear counter, which is, by the way, all that is required under the law is a 36-inch wide counter. The other two instances are, again, if you look at the photographs, they indicate that there are items, miscellaneous items, and always different items on the first occasion and the second occasion, which again goes to show you that the items were, in fact, moved. They were temporary, that they weren't there permanently. So the case with regard to the counters is absolutely compelling. Summary judgment should have been granted for Pier 1 on that issue. I had cut you off from your argument about the introduction of the Snow Declaration, so if you want to go on to that. Thank you. I really do appreciate that. So, Your Honor, we do believe that the exclusion of the Snow Declaration was an abuse of discretion. Basically, it's undisputed that the store manager was identified in interrogatory number 12 in discovery in this case. Because of the importance of that response, I'm just going to read it, because I want to establish here that it wasn't hiding anywhere. This wasn't some casual reference that Pier 1 made. Pier 1 said, in response to interrogatory number 12, Pier 1 maintains policies at the store to keep the various public areas of the store accessible for disabled patrons and has reaffirmed this commitment to plaintiff as well as a willingness to modify areas of the store that are deemed to be inaccessible. The following individuals will have knowledge regarding Pier 1's policies at the store in question, the regional manager and the store manager of the store at issue. These individuals can be contacted through counsel of record. Go ahead. Even assuming, apart from the fact that it still doesn't name the person, all that answer does is say, this person has knowledge about procedures. It doesn't say anything about the facts in this case. Well, as she says, let me just say, it's policies at the store to keep the various public areas of the store accessible for disabled patrons. These individuals, i.e., the store manager, has knowledge of such policies. You know, at the end of the day, one of the things that I want to point out is that Plaintiff's counsel has never actually said in any document that had Ms. Snow been named by name as opposed to by her title, he would have deposed her. It made no difference to them. They did not attempt to depose anyone. The fact is, Pier 1 said, there's a store manager with knowledge of the policies to keep the store accessible. That would be like keeping the store accessible. But my understanding of the complaint about why the declaration was not admitted is that it isn't limited to policies. At least that's one of the reasons. It was refuting on some specific percipient basis some of the observations that were made. Well, the exclusion was complete. I mean, he didn't consider any of it. And he didn't, and because it was completely stricken. That's partly because the policies aren't, I mean, I would suppose what he was thinking was the policies aren't very relevant. The question is what was going on in the ground. And as to what's going on in the ground, there wasn't any notice that this was a person. Well, Your Honor, I would refer you to the Iden v. Home Depot case, which is also a decision by Judge Carlton. And in that case, Home Depot produced evidence of its policies, and Judge Carlton determined that that was enough to go to trial. That created a genuine dispute of fact. The plaintiff there said, you know, well, clearly those policies aren't working, which is essentially what the plaintiff is saying here. And Judge Carlton said, well, they've got policies, so basically there's a dispute of fact. So at a minimum, it was obviously very important evidence, and it would have at least kept summary judgment from being granted against Pier 1. And it shouldn't have been granted. Ginsburg. Well, that was the question I had. If the Court found that there was a material issue of fact which precluded summary judgment in favor of Pier 1, how could it find there was no material issue of fact and give summary judgment in favor of Chapman? I agree, Your Honor. I mean, essentially, at a minimum, although we think that the Court could have decided it on summary judgment for Pier 1, the fact that there were policies in place, the fact that Mr. Chapman saw people implementing the policy, that's his admission, not ours, okay, those two facts alone should have created enough of a dispute to basically deny summary judgment for Mr. Chapman. What if the district court was not, did not err in striking the declaration? Would your answer still be the same? Would there be an issue of fact without the declaration? No, there would not, Your Honor. And that is why we, it's our position that this was a terminating sanction. Okay? And this gets to the other issue. I mean, basically by excluding this evidence, Judge Carlton, you know, just eviscerated Pier 1's case with regard to the aisles, not with the counters, because we don't think there's even enough evidence at all with respect to the counters. But certainly with respect to the aisles, once those policies were gone, there was nothing left to basically establish that these are temporary obstructions. With respect to the counter, even without the declaration, do you think there was a material issue of fact that would preclude summary judgment in favor of Chapman? Your Honor, no. Actually, for that issue, we don't think there's an issue. There's a dispute of fact. How about the aisles? Do you think there was an issue without the declaration? If the declaration is not considered, is there an issue? No, because there's no policy. Okay. No. I mean, I would say, I'd have to say no. All right. Thank you. So the other, let's see. I guess I'm somewhat, I want to focus again back on this terminating sanction concept. We're running out of time. So if you want to keep any. Okay. I will keep my time. Thank you, Your Honor. We'll give you a minute to rebuttal. Good morning, Your Honors. Scott Hubbard on behalf of plaintiff. I'm used to saying appellant. And appellee, Byron Chapman. I have some points I'd like to hit in response to opposing counsel, unless you have any questions or anything you'd like me to discuss first. Fair enough. First, I would simply say in response, opposing counsel says that the policies of maintaining store aisles is working as evinced by Mr. Chapman's declaration where he went and shopped at the facility and the employees were moving merchandise out of his way. That was on, I included a copy of it on SER page 5. If you'll note that the date that that occurred was the same day that we sent his wife in. God, I forgot her name. I'll just say Mrs. Chapman. Same day. And at SER 78, she describes how she met with no employees. No one was moving merchandise out of her way. No one cared about her. Nothing of the kind. Second, I would just say that maximum extent feasible is defined by the Code of, by the Department of Justice. It's at 28 CFR 36. Now, this one's memory, and I might have to send a 28J on it. I think it's 36.403C. And if you look at Appendix B where it describes what it means, it means virtually impossible. So the question becomes, is it virtually impossible to maintain clear aisles? And third, Judge Rawlinson, you asked the good for the goose, good for the gander argument. If the judge denied summary judgment on, for the defense, why shouldn't it deny it for us? The defense was advancing two or three points, and I'm shooting from the hip here. I didn't want to dig through the record, but it's in the defendant's excerpts of records. One was mootness. One was that there was no barriers. And the third was a legal argument. Temporary barriers can't support ADA violations. The mootness, all of those, if you rule against Pier 1 on all of those, it does not necessarily mean that you have to rule against us on the summary judgment, because we offered evidence that there were barriers. Question of law, temporary interruptions are barriers. And mootness, there's still barriers. And that's when he went to ours. And that's all I have to say. I would like to hear more about the counters. The evidence seemed considerably weaker and was a little hard to figure out. It was. What the concern was. It was considerably weaker. At first, the counters weren't, if memory serves, and it's been a number of years. The counters were not in the complaint. They weren't. The counter heights weren't in the complaint. When we did the amended complaint, it was just material blocked with merchandise. And so when we initially filed it, and this is memory, I'm shooting from the hip here. When we first filed this complaint 10 years ago, I believe counter height was an issue. But I believe that they had since modified the counter to provide a lower one. So when we amended our complaint coming down, counter height wasn't an issue, but blocked merchandise was. So there were times that the counters were blocked with more merchandise than other, but they were blocked with merchandise. Plus, I mean, you're standing there at the counter. If there's a problem, you just say, take it away. And that's true of anybody. That's true of anyone. It's not true of Iles. Iles is a different story. But, you know, if you're standing, it happens all the time. You go to the counters that are blocked up. You're saying, I want to put my stuff down, take it away. Fine. I'll take it away. Fair enough. But there are other cases where a blocked counter is a bigger deal than it is for Mr. Chapman, who might have his hands full but might not. Could he put, you know, I'll just say it's the weaker part of our case. The blocked Iles is definitely the stronger one. We do have photographs showing that the counter was blocked with merchandise, not completely, but — Kagan. So ultimately, so here's a question. Ultimately, what — what — does — did the summary judgment result in an injunction? It did. And what did the injunction say? Boy, it's in the first Volume I. I believe Judge Carlton — forgive me. Can I have 30 seconds to look at the exact language? It's in the first page of Volume I. Permanent injunction. Here we go. Here it is. Judgment of permanent. The impermanent injunction, blocking the Iles with merchandise or other obstacles, except for unavoidable transitory blockages caused by restocking or similar activities and cluttering the accessible counter. Kagan. All right. So what is the — what is the retailer supposed to do about the fact that when I go into Pier 1 and I want to look at a — a pillow, I take the pillow out of wherever it is and I'm sloppy and I don't put it back? Put signs up or what? Well, that's the other thing, is we're not asking for perfection. And if you look to the days that we picked, we — Well, blocking the Iles of its back of a store with merchandise or other obstacles such that the clear path through the Iles is narrower than 30 square inches wide, except for the unavoidable transitory blockages caused by restocking or similar activities. That suggests, you know, something necessary to do. Well, it's not necessary for people to leave things in the aisle, but they do it. It's not always Black Friday at this Pier 1. I'm sorry, what? It's not always Black Friday at this Pier 1. There are — there's a lot of downtime for these employees. As a matter of fact, as I was saying, if you look at the dates that we selected to send out Mr. and Mrs. Chapman — the Chapmans and our expert, we didn't pick busy shopping days. We excluded them. We picked the middle of February and the middle of March and July and August, not times when you'd expect a lot of people, and there were blocked aisles. Isn't the answer that they have to have enough employees that they can keep track of them? I, right now, would focus more on changing the policy. Maybe they just have to send the employees they have through more often. I don't think it's necessary for them to hire an ADA coordinator at every store, if you will. I was going to say, I don't think more employees is the right answer. It would probably depend on how many employees they had. I mean, they need enough employees that they can monitor their aisles, I take it, is what you're saying. And that's what I'm saying, please put back anything you take out. Perhaps. But I think Judge Carlton's order was broad enough to give them enough room to figure out what it takes for them to do it. So what about the declaration? I mean, it certainly would appear that with regard to the policy, at least, there was, you know, at least substantial enough compliance, i.e., you knew who this person was. And if you wanted to depose somebody without a policy, you could have done it. So why can't, at least as to the policy, the declaration be admissible? That's funny, because I would have gone the other way. I would have said, of everything, the policy would be the least likely one to go in. Except that it was mentioned. I mean, I'm saying that it was in the interlocutories that if you want to know something about the policy, go talk to the store manager. Well, I'm sorry. Could you repeat the question? I kind of lost it in that one. I want to know why, since the interlocutories did say if you want to know something about the policy, go talk to the store manager, which would be obvious anyway. What is the problem with the declaration, at least with regard to the policies? Because you just mentioned the policies. Right. So the policies do seem to have some relevance. Process arguments never win. Well, never say never. Okay. Sometimes process arguments never win. With respect to the store manager, we made a judgment call. We, by then, the photographs were coming in, and so we didn't need the store manager for, to establish our claim. And we knew, pursuant to the initial disclosure rules, that eventually, Pier 1 would have to disclose this person and then what they're going to testify to, and then we could take their deposition. By the time the summary judgment came around, and in comes this nine-page declaration from the store manager offering testimony about our clients' visits and the experts there and how plaintiffs knew about them the whole time, which is kind of a little bit silly, that's when we had to speak up. And we didn't even speak up much. It was just a paragraph telling the judge, hey, listen, she wasn't disclosed in initial disclosures or the discovery we propounded. But that didn't answer my question, which is what about, with regard, some of the declaration is about the policies. Right.  You said before that one of the things you might want to do to comply with this injunction is to change the policies. So the policies are of some relevance. The policies are. And why, at least with respect to the policies, was not those portions of the declaration proper? I think with respect, and forgive me, I'm still a bit unclear. I think with respect to the policies, it does not matter one way or another whether or not they come in, because the aisles are still blocked with merchandise. It doesn't matter if they have a policy in place or not. Well, I suppose it might be of some relevance to what's transitory or temporary. I mean, if they're going, sending somebody, if the policy were every 15 minutes we send somebody through, but you still came up with the, I mean, at some point it becomes absurd. There's nothing we can do about it. Right. Well, I don't think we've reached that point yet. But at this stage, I'm not entirely certain. My answer is I'm not entirely certain it would have mattered one way or the other, because I'm looking at it from the results standpoint. And the results standpoint is our guy visited 29 stores, or we made 29 visits to all the stores in the area, and they all had blocked aisles. Thank you very much. Thank you, Your Honor. About a minute in response. I'd just like to say, make a few points here. Of course it matters whether or not a store has policies to maintain its accessible aisles. That is exactly what the Department of Justice expects folks to do. That is what Judge Carlton said was important in the Home Depot case in concluding that there was a dispute that warranted going to trial. I mean, what exactly is a retailer to do if it has people and customers moving things around? Of course it's supposed to have a policy. And if the policy is, in fact, every 15 minutes you're going to run around the store and put everything back, then of course it's a temporary interruption. It's in – and there's no way that a pure one – this isn't out – I want to point this out. This store is an outlet location where there are lots of people. And there is no evidence in the record that these were not busy shopping days. I mean, so, again, I object to that statement. At the end of the day, it is a busy outlet store with lots of customers, and Tracy Snow testified about the habits of the customers, too, which was also very important. And I also want to point out, too, that the Chapmans and counsel did know about Tracy Snow. Okay. With her name. Ms. Snow rang up Mr. Chapman. She's on the other room. They didn't know that you were intending to introduce any evidence from her. I'm sorry? But they didn't know that you were intending to introduce any evidence from her with regard to the status of the stores. Well, they knew that she was the store manager. Ms. Chapman, Judy – But they didn't know that you were intending to introduce any evidence. You didn't – you didn't produce that information. Well, she was identified in the interrogatory as the store manager would have information about the policies. Well, she actually wasn't. But that, again, was the policies. At the time, right. All right. Thank you very much for your time. Thank you. Thank you. Both of you. The case of Ocampo versus – I'm sorry. Chapman v. Pier 1 Imports is submitted, and we are in recess. Thank you.
judges: Bucklo, Berzon, Rawlinson